UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CREDIT UNION ON-LINE, INC.,    )
       Plaintiff,      )
           )
v.          )    CIVIL ACTION NO. 04-12176 GAO
           )
OPEN SOLUTIONS, INC.,     )
       Defendant.     
           )

## OPPOSITION BY PLAINTIFF TO MOTIONS BY DEFENDANT TO DISMISS AND FOR TRANSFER, WITH MOTION TO STRIKE BY PLAINTIFF

Credit Union On-Line, Inc., plaintiff in this action ("CUOL" or "plaintiff"), opposes two motions served by defendant Open Solutions, Inc. ("Open") on October 22, 2004 ("Motions"). Open moves to dismiss or for a definite statement under Rule 12(e) ("Rule 12(e) Motion"). Open moves to dismiss or transfer for improper venue ("Transfer Motion").

Neither motion has merit. The Motions are supported by one affidavit, that of Mark Roberson. CUOL moves to strike that affidavit. See point D (p. 13), below.

## A.    The Rule 12(e) Motion Is Frivolous.

This Complaint is not an appropriate subject for a Rule 12(e) challenge. **The class of** pleadings that are appropriate for a Rule 12(e) challenge is quite small. See, e.g., Feasge v. Town of Shrewsbury, 188 F.Supp. 2d 16 (D.Mass. 2002); Wright, Miller & Cooper, FEDERAL

- 1 -

PRACTICE AND PROCEDURE: Jurisdiction 2d (1986 ed.), §1376, p. 311 (hereinafter, "Wright, FEDERAL PRACTICE").

Open does not begin to satisfy the burden of proof required under Rule 12(e). The motion is proper only when the pleading to which it is addressed is so vague that it cannot be responded to, in which case the information sought is that necessary to frame a responsive pleading. Id., §1377, p. 340, 341   Thus, "if the moving party is able to discharge [its] pleading obligations under the rules, a Rule 12(e) motion based on the belief that a better...pleading by the opposing party will enable [it] to provide a more enlightening or accurate response will be denied." Id., §1377, p. 341, 344 (emphasis added).  The elimination of pre-federal rule practice involving bills of particulars drastically limited the use of Rule 12(e).   Wright, FEDERAL PRACTICE, §1377, p. 338.

Open professes to not understand the Complaint fully ("...it appears to assert"..."seems to allege"..."appear to be based"..."murky [sic] assertions...," (Motion 2, Rule 12(e) Memorandum, p. 1).  Lack of understanding of the Complaint is boldly contradicted, however, in the two Open motions served October 22, 2004 and the exhibits to those motions.  Open admits that the Complaint, Count IV, seeks declaratory relief by reason of, *inter alia*, Open's August 30, 2004 written allegations that CUOL was in breach of an ongoing goods and services support agreement between the two.  Rule 12(e) Memo., p. 1, 2.  Open also concedes that Open after July, 2003 has regularly shipped computer and software to Open pursuant to Open's obligations under a written August 19, 1994 Agreement binding FiTech, a non-party, as the obligor.  Open Ex. A, M. Roberson Affidavit, October 21, 2004, paras. 3, 5, 8.  The words of the Complaint make clear that CUOL's claim for breach of contract, Count II, relates to services due under that

Agreement. This Complaint as to all counts is nowhere close to "murky" or not intelligible. A similar conclusion, no wild guesswork required, is that by Count VI CUOL alleges violation of the covenant of good faith as to that very same agreement, and not, for example, as to a nonexistent agreement. (But see Rule 12(e) Memo, p. 8, arguing that Open cannot answer Count IV because Open cannot identify any agreement between the parties). A party pretending selectively to be dim cannot create a Rule 12(e) issue.

Particularly in contract actions, use of Rule 12(e) is not approved. It is "well established that in a broad spectrum of contract actions, absent special circumstances, the plaintiff should not be required to plead details about the terms of the contract...as long as the defendant has reasonable notice of the plaintiff's contract based claim...," and, in that circumstance, a more definite statement is not required. Wright, FEDERAL PRACTICE, §1377, p. 353-356.

Rule 12(e) is disfavored generally because it offers potential for needless delay. Wright, FEDERAL PRACTICE, §1378, p. 379-380. Rule 12(e) is "a fertile field for dilatory tactics." Id., §1378, p. 375. This case is wholly unlike, e.g., Williams v. Astra, 68 F.2d 29, 37 (1999), cited by Open. A Complaint there was dismissed with leave to amend because plaintiff failed to allege facts essential to specified counts, failing, e.g., to allege "the terms of any contract or its duration." Id. at 37.

Open's Rule 12(e) protests are contrived. Open by its simultaneous October 22, 2004 motion to transfer admits that Open asserts to be the "successor in interest" [sic] to FiTech, a party to the 1994 Agreement. Roberson Aff., para. 8. Open admits that technology, goods, and services have been supplied by Open and others ("the agreement [sic] performed") for roughly ten years. Transfer Memo, p. 7, 8. Open admits declaratory relief is sought by CUOL here

because of, *inter alia*, Open's written declaration on August 30, 2004 that CUOL is in breach of what Open contends is the agreement. Transfer Memo, p. 1, 2. Open in the context of transfer purports to understand the Complaint and all of its implications so well that Open is able to assert that <u>all</u> key trial witnesses relevant to this (*sc.* unintelligible?) Complaint reside in Georgia. See Transfer Memo, p. 8, purporting to describe the "<u>proof relevant to plaintiff's claims</u>" as centered in Atlanta, Georgia. Any such Complaint is not unintelligible. Open admits that after July, 2003 and until most recently has been obligated to perform supply and support obligations after July, 2003 in favor of CUOL. Roberson Aff., paras. 3, 5, 8. Willful and wrongful nonperformance by Open of required services by improper means is not a mystery topic: interferes with CUOL's existing and prospective relationships. Complaint, Counts IV, V.

Open, in the October 22 Motions speaks from both sides of one mouth. That self-contradiction without more shows that Open's Rule 12(e) Motion is frivolous.

## B.    Motion To Transfer.

The Open October 22 motion to transfer is inconsistent with, and barred by, the Open Rule 12(e) motion. If Open cannot understand the Complaint to the minimum degree needed to answer Rule 12(e), Open surely cannot identify by geographic and other detail the crucial trial witnesses in a reliable way. (<u>But see</u> Transfer Memo, p. 8, describing situs of proof relevant to plaintiff CUOL at trial as centered in Georgia.)

This civil action, filed in the state of CUOL's residence, is proper as to venue. 29 U.S.C. §1391. It is an indisputably proper exercise of CUOL's "right to adjudication." <u>McCarthy v. Azure</u>, 22 F.3d. 351, 355 (1st Cir. 1994).

A decision to transfer a case pursuant to § 1404 rests within the sound discretion of the trial court. See Codex Corp. v. Milgo Elec. Corp., 553 F.2d 735, 737 (1st Cir., 1977). "A presumption in favor of the plaintiff's choice of forum exists, and the burden of proving that a transfer is warranted rests with the defendant." See Fairview Machine & Tools Co., Inc. v. Oakbrook International, Inc., 56 F. Supp.2d 134, 141 (D. Mass., 1999) (citing Princess House, Inc. v. Lindsey, 136 F.R.D. 16, 18 (D. Mass., 1991) and McEvily v. Sunbeam-Oster Co., Inc., 878 F. Supp. 337, 344 (D.R.I. 1994)).  In making its determination, the Court must balance several factors, including the convenience of the parties and witnesses, the availability of documents and the interests of justice  Princess House, 136 F.R.D. at 18. Of the factors, the convenience to the trial witnesses is probably most important. Id.

A defendant moving for transfer must show "that the original forum is *inconvenient for* it and that the plaintiff *would not be substantially inconvenienced by* a transfer." Wright, FEDERAL PRACTICE, §3849, p. 408, emphasis added. The burden is on defendant. Wright, FEDERAL PRACTICE, §3848, p. 383

Open fails to carry its burden. CUOL is a business organization resident in Waltham, Massachusetts  Verified Complaint, 1  All key witnesses for plaintiff other than nonparties presently reside in Massachusetts. Boretti Affidavit, Tab C, paras. 1-4. At least three of the persons involved in the recent disputes for Open work full-time at Open in Glastonbury, Connecticut, just outside Hartford. Id. Open is located in Connecticut, not Georgia. See Open Ex. B, August 30, 2004 correspondence from Connecticut to CUOL in Waltham.

Open seeks transfer to a jurisdiction, Georgia, not identified with any party, not identified as being the residence of any material witness, and not alleged to be convenient to either party.

Open seeks transfer to Georgia under 28 U.S.C. §1404 because Open possibly at a future date may seek arbitration in Atlanta. Mere possibility is never relevant to 28 U.S.C. §1404 analysis. It is not relevant to transfer absent proof of a binding, relevant, arbitration agreement. Point C, below.

A motion for transfer which fails to specifically identify witnesses and testimony is properly denied. Wright, FEDERAL PRACTICE, §3851, pp. 427-428 and cases there. Open relies here solely on the vague allegations by Roberson that in 1994, long prior to any present disputes, a company in Georgia, FiTech, was the obligor. That is immaterial. FiTech is not a party. There is no dispute pleaded in the Complaint as to events during the time in which FiTech was the sole obligor from 1994 to 2000. FiTech performed as required. FiTech, unlike Open, was not a direct competitor of plaintiff. FiTech, unlike Open, is not attempting to acquire this plaintiff or injure this plaintiff by deliberately withholding good and services already paid for by plaintiff. See Verified Complaint, paras. 5, 6, 7.

The fact that this jurisdiction is the residence of plaintiff (Complaint, para. 1) is, with other factors, highly favorable to retention of jurisdiction here. Holmes Group v. Hamilton, 249 F.Supp. 2d 12, 14 (D.Mass. 2002) (presumption in favor of plaintiff's choice of forum); Sigros v. Walt Disney Co., 129 F.Supp. 2d 56, 71 (D.Mass. 2001) (defendant's burden regarding transfer). See Wright, FEDERAL PRACTICE, §3849, p. 398, noting many cases in which that factor is dispositive for denial of transfer. Open does not begin to show that Connecticut is more convenient to it, nor that Open is inconvenienced here. Georgia is patently inconvenient for both parties and geographically remote from either. Transfer to Georgia will impose financial burdens

- 6 -

and inconvenience on both parties.  Open apparently seeks to bear, and impose, those pointless burdens.

The written 1994 FiTech Agreement does identify Georgia law as the choice of law as to interpretation of that 1994 text.  Tab A, Art. 5.4.  A choice of law term is not, however, a venue provision.  28 U.S.C. §1404 expressly involves only the convenience of parties and witnesses, not choice of interpretative law.  Open is not a party to the 1994 agreement, or an original assignee.  See Boretti Aff., paras. 5-7.  This Complaint in any event asserts Massachusetts common-law causes of action plus Chapter 93A violations under Massachusetts law.  Those are governed by Massachusetts conflict of law rules.  Bushkin Associates v. Raytheon Co., 393 Mass. 622, 632 (1985) (Massachusetts' choice of law is jurisdiction with most significant relationship to parties and events).  If transfer were supported, which it is not, a federal court in Georgia will be required to apply Massachusetts law to some or all of the causes of action here. Id.  That defeats any argument for transfer based on the 1994 textual choice of law.  See Wright, FEDERAL PRACTICE, §3846 (noting special considerations as to transfer of diversity cases), and §3854 (noting that the substantive law applied in diversity is state law).

Open also fails to show that Georgia law is substantively different from Massachusetts law as to any matter in dispute.  If any choice of law term in the 1994 text were decisive or relevant under 28 U.S.C. §1404, which it is not, Open fails to show any increased convenience in transfer to Georgia.  The geographic inconvenience on all other points far outweighs any possible convenience because of Georgia law.

**C.**    **Possible Future Arbitration In Atlanta Is A Red Herring As To Transfer.**

The principal fact used by Open as to transfer is the existence of an arbitration provision in the 1994 text binding FiTech, a nonparty.  See Transfer Memo, p. 3.  See Tab A, Addendum 5, page 45   The 1994 text expressly provides that the obligor bound is FiTech as a party, "and [FiTech's] agents and affiliated businesses.   No purported successor in interest or future assignee is mentioned in the arbitration term.  Tab A, p. 45

Argument that arbitration is a basis for transfer (Transfer Memo, pp. 9, 11) assumes, but does not prove, the matter at issue.  Open confuses 1994 with 2004.  Open is not a party to the 1994 text.  Nothing shows that the 1994 text binds these parties.  Nothing shows any intent of these parties, Open and CUOL, to arbitrate.  FiTech assigned this agreement in 2000 to Liberty.  Boretti Affidavit, paras. 6, 7.  CUOL assented.  Id.  Liberty somehow transferred its obligation to Open in 2003.  CUOL did not assent.  Id.  Open assumes contrary facts.  See Transfer Memo, pp. 9, 10:  the "parties' [sic] preference for Georgia arbitration"..."bargained for by the parties' [sic]).

Because there is no written agreement by Open or with Open as to arbitration, Open's accusations as to "forum shopping" [sic] (Transfer Memo, pp. 2, 10) miss any mark.  Arbitration 'is a matter of contract...a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit."  AT&T Tech. v. Comm. Workers, 475 U.S. 643, 648 (1986), quoting United Steelworkers v. Warrior & Gulf Navig., 363 U.S. 574, 582 (1960).  Thus, "a party seeking to substitute an arbitral forum for a judicial forum must show, at a bare minimum, that the protagonists have agreed to arbitrate some claims."  McCarthy v. Azure, 22 F.3d 351, 359 (1st Cir. 1998) (emphasis added).

This imperative is "in no way inconsistent with" the acknowledged "federal policy favoring arbitration." McCarthy, supra, at 354, citing Cone Mem. Hosp. v. McCarthy Constr., 460 U.S. 1, 24 (1983); see also Shearson/Am. Express v. McMahon, 482 U.S. 220, 226 (1987). The federal policy in favor of arbitration is not triggered absent "proof of a preexisting agreement to arbitrate disputes arising between the protagonists." Id. "Once that agreement has been proven and the protagonists identified..." a "healthy regard" for the policy favoring arbitration requires that "any doubts concerning the scope of an arbitrable issue be resolved in favor of arbitration." Cone, 460 U.S. at 24-25 (1983). A preference for arbitration policy, however, does not extend to situations in which the identity of the parties who have agreed to arbitrate is unclear. PaineWebber v. Hartmann, 921 F.2d 507, 511 (1991) (holding that "as a matter of contract, no party can be forced to arbitrate unless that party has entered into an agreement to do so"). Thus, "requiring that arbitration rest on a consensual foundation is wholly consistent with federal policy." McCarthy v. Azure, 22 F.3d 351, 354-355 (1st Cir. 1998).

This sharp distinction makes sense because subject-matter jurisdiction over an action or series of claims can be conceptualized as conferring a personal right on the parties to have that action, or those claims, adjudicated in a judicial forum. McCarthy, supra, citing Pacemaker Diag. Clinic of America v. Instromedix, 725 F.2d 537, 541 (9th Cir. 1984) (en banc) (recognizing that the "federal litigant has a personal right, subject to exceptions in certain classes of cases, to demand Article III adjudication of a civil suit"); accord, Glidden Co. v. Zdanok, 370 U.S. 530, 536 (1962). A person may, by contract, waive his or her right to adjudication, see 9 U.S.C. §2, but there can be no waiver of litigation "in the absence of an agreement signifying an assent to arbitration." McCarthy v. Azure, 22 F.2d 351, 354-355 (1st Cir. 1994). The basic prerequisite

[to arbitration] is the parties' agreement to arbitrate, or, put another way, the existence of <u>an actual waiver of the right to litigate</u>. <u>McCarthy, supra</u>, at n. 7.  No party can be forced to arbitrate unless that party has entered into an agreement to do so.  <u>McCarthy, supra, citing AT&T Tech. v. Comm. Workers</u>, 475 U.S. 643, 648 (1986); <u>Steelworkers v. Warrior & Gulf Navig.</u>, 363 U.S. 574, 582 (1960); <u>Morristown Daily Record v. Graphic Commun. Union, Local 8N</u>, 832 F.2d 31 33 (3d Cir. 1987).

Before compelling an unwilling party to arbitrate, 9 U.S.C. §4 requires that the Court engage in a limited review to ensure that the dispute is arbitrable--i.e., that a valid agreement to arbitrate exists between the parties and that the specific dispute falls within the substantive scope of that agreement.  <u>Id</u>.  <u>See AT & T Techn.</u>, 475 U.S. at 649; <u>John Wiley & Sons, Inc. v. Livingston</u>, 376 U.S. 543, 546-47 (1964); <u>Laborers' Internat. Union v. Foster Wheeler Corp.</u>, 868 F.2d 573, 576 (3d Cir. 1989); <u>PaineWebber, supra</u>, at 511   A Court must decide all questions of arbitrability <u>before</u> the parties are ordered to proceed to arbitration.  <u>First Options v. Kaplan</u>, 514 U.S. 938, 944 (1995).

Transfer to possibly explore <u>possible</u> rights as to arbitration is premature and unworkable. Open at this time does <u>not</u> demand arbitration and <u>has</u> not demanded it.  Open makes no motion to compel arbitration under 9 U.S.C. §4, nor a motion to stay this action under 9 U.S.C. §1 Open nowhere shows that it is a party to a written agreement <u>with CUOL</u> requiring arbitration between those two.  Open, in arguing for transfer, alleges only that <u>FiTech</u> was a party to a 1994 written agreement possibly requiring arbitration (Transfer Memo, p. 2).  Open concededly is <u>not</u> a party to that agreement.  In that Open has <u>not</u> moved for a stay pending arbitration in Atlanta, Open has waived or very possibly will waive any putative right to arbitration.

If Open does intend to seek arbitration in the future, Open should do so here. An order of transfer to Georgia divorced from an order to compel arbitration assumes the matter at issue. This Court can, and must if requested, first decide whether Open has an enforceable right to arbitrate. If Open does not seek arbitration, possible arbitration in Atlanta is irrelevant and transfer to there is inappropriate. There is, on this record, no stipulation that Open demands arbitration anywhere.

A possible future request for arbitration by Open is not a relevant or permissible factor under 28 U.S.C. §1404(a). To allow a mere possibility to control transfer under §1404 is impractical and unfair. The parties, if sent to the Northern District of Georgia, will have no clear record of whether Open demands or ever will demand arbitration. There will have not yet been any determination that Open is entitled to seek arbitration. All factual issues necessary to be adjudicated prior to arbitration will then need to be litigated in Georgia, a forum not convenient for either party for that purpose or any other purpose. Those issues will include: (i) whether there is any present valid assignment of the FiTech 1994 Agreement in writing in favor of Open, (ii) what the terms of that assignment are, (iii) whether there are other documents which create rights in Open to arbitration as the purported successor in interest to FiTech under the 1994 text, and (iv) whether it was the original intent of FiTech and CUOL in 1994 that an arbitration obligation run forward with any valid assignment.

The Georgia District Court is not the sole Court with the power to compel arbitration if Open later requests it. Open argues for transfer as if only the Georgia Court has the power to compel arbitration. See Transfer Memo., p. 7, n. 2, and cases there. That is incorrect. KKW Enterprises v. Gloria, 184 F.3d 42, 50 (1st Cir. 1999) (requiring a stay of litigation in Rhode

Island pending arbitration in Chicago). 9 U.S.C. §1 *et seq.* creates substantive rights of national and international application. Forum selection causes are enforceable by Courts <u>not</u> situate in the selected forum. In <u>Bremen v. Zapata</u>, 407 U.S. 1, 10 (1972), the forum selection clause enforced by the United States Supreme Court required arbitration in <u>London</u>. 9 U.S.C. §4 expressly provides for broad jurisdiction: A party aggrieved by refusal to arbitrate may petition "<u>any</u> United States District Court which.. .would have jurisdiction...in a civil action...[as to] the subject matter of a suit arising out of the controversy between the parties, for an order directing that such arbitration proceed in the manner provided for." The sole limits on power to order arbitration are personal jurisdiction and due process. That power certainly exists in this Court. 9 U.S.C. §4.

The cases relied on by Open (Transfer Memo, p. 7, note 2) do not limit the power of a Court with jurisdiction to compel arbitration.\\[1] They stand for an inverse and irrelevant proposition: a Court located in the place where a forum clause is selected <u>does</u> have personal jurisdiction to enforce that clause. Consent to personal jurisdiction is implied by reason of the valid, agreed, forum selection clause. 9 U.S.C. §4.

Open, by refusing to demand arbitration and refusing to move under 9 U.S.C. §4, creates substantial risk of wasteful and pointless litigation in Georgia. The outcome of that litigation very likely will be that Open has no right to arbitrate. That makes sense of and is consistent with Open's silence to date. Transfer now, <u>before</u> any determination as to the right of Open to demand arbitration, and even before any stipulation by Open that it <u>does</u> demand arbitration, will

---

[1]     Open (Transfer memo, p. 7, n. 2) cites to <u>St. Paul Fire v. Courtney</u>, 270 F.3d 621, 624 (8th Cir. 2001), and <u>Cashman v. Kimmons</u>, 2004 U.S. Dist. Lexis 44 (2004). Those cases are inapt. They would be on point if this action were brought in Georgia to compel arbitration, and if it were there argued that the Georgia Court lacked

create a clear prospect of pointless expense and delay.  See discussion above, as to misuse of

Rule 12(e) as a dilatory tactic.\\[2]

Open raises, in addition to 12(e) arguments, a series of generic arguments (Rule 12

Memo, pp. 8-10) that specific causes of action in the Complaint state no claim.  Those arguments

are premature or academic.  Cases can always be found identifying when this or that cause of

action is not stated.  The Complaint controls here, the Complaint pleads deliberate, substantial

breach of contract for collateral, improper purposes such that c. 93A liability, for example, is

well-pleaded.  Compare Community Builders v. Indian Motorcycle, 44 Mass. App. Ct. 537, 559

(1998) and cases there, with Open Rule 12 Memo, page 9.

### D.    The Roberson Affidavit Should Be Stricken For Purposes Of The Motions By Open.

The Roberson Affidavit is irrelevant and properly stricken.  It refers only to events or

facts in 1994 and prior in time to the present (2004) disputes.  The Roberson Affidavit is also

insufficient and irrelevant to transfer.  It mentions no dates or specific subjects relevant to

transfer.  What matters for transfer under 28 U.S.C. §1404 are the issues in dispute.  The

Roberson Affidavit names no specific witnesses nor any subjects of relevant, expected testimony

by those persons.  Paragraph 9 is illustrative.  It is vague, argumentative, and irrelevant.  It argues

that "a majority of FiTech employees...familiar [sic] with matters [sic] relating to the [1994]

Agreement [sic]..." reside in Georgia.  That, even if true, is irrelevant.  What matters for transfer

---

personal jurisdiction.  None of that is relevant to whether transfer is required from this Court where, as here, both
parties are subject to personal jurisdiction here.

[2]    CUOL objects, but declines further comment on, arguments without record support or based on non-
admissible topics.  ("sprinting...to preempt...the forum choice [sic] of the opposing party [sic]..."..."forum
shopping...") (Transfer Memo, p. 2, 5).  See Transfer Memo, p. 11-12, "Most astonishingly [sic] [the] rush to the
courthouse [sic]...appears to have been [sic] an attempt to mislead [sic] [Open] as to settlement [sic]."

is precise identification of witnesses who know facts essential to trial of this civil action.  The

locale of persons involved in largely irrelevant matters since 1994 is immaterial.


**E.  Conclusion.**

CUOL requests that each of Open's motions, (i) to dismiss or (ii) to transfer venue, be

denied.



Plaintiff,
CREDIT UNION ON-LINE, INC
By its attorneys,

Paul G. Boylan, BBO No. 052320
David M. Thomas, BBO No. 496100
DONOVAN HATEM LLP
Two Seaport Lane
Boston, MA 02210
617-406-4500

Dated: Nov 19, 2004

- 14 -

## Certificate of Service

The undersigned counsel for plaintiff CUOL hereby states that on this date he served the foregoing **Opposition By Plaintiff To Motions By Defendant To Dismiss And For Transfer, With Motion To Strike By Plaintiff,** by e-mail filing to the Clerk, D.Mass., and by e-mail to counsel for defendant Open, Daniel J. Cloherty, Dwyer & Collora, LLP, 600 Atlantic Avenue, Boston, MA 02210-2211.

Dated: _November 19, 2004_                                        _____

24805.0//00871675

- 15 -

3.15



FiTECH Systems

# STANDARD
# IN-HOUSE AGREEMENT

*CREDIT UNION ON-LINE, INC.*
*Waltham, MA*

*Atlanta Division:*
*3098 Piedmont Road, N.E.*
*Suite 400*
*Atlanta, Georgia  30305*

*Greensboro Division:*
*706 Green Valley Road*
*Greensboro, NC  27408*



404MG10

*Exhibit A*
Credit Union Opposition; November 19, 2004

JUN-30-2003  11:53    LIBERTY FITECH SYSTEMS    404 233 4815    P.02

TECH STANDARD AGREEMENT

## Credit Union On-Line, Inc.

FiTECH Systems, L.P. ("FiTECH"), a Georgia limited partnership, and the Customer whose name appears above ("Customer") agree that all Products, Application Software, and services to be provided by FiTECH to Customer hereunder shall be furnished only under the terms and conditions of this Agreement. The terms of this Agreement shall control notwithstanding any contrary provision of any purchase order used by Customer to effect the furnishing of any Products, Application Software, and services. This Agreement shall be effective only when executed by Customer and accepted in writing by an authorized officer of FiTECH at its offices in Atlanta, Georgia or Greensboro, North Carolina. Notice of acceptance is waived. Customer will be furnished a copy showing acceptance by FiTECH.

Customer: CREDIT UNION ON-LINE, INC.

By: _(signature)_

(Signature)

Constance D. Boretti

(Typed Name)

Title: President

Date: August 29, 1994

Accepted: FiTECH
By: FiTECH, Inc.
Its General Partner

By: _(signature)_

(Signature)

Sanders N. Greer

(Typed Name)

Title: President

Date: 8/29/94

Schedules and Addenda Attached (apply if box checked): Please acknowledge receipt of each Schedule and Addendum attached by initialing each page of the Schedule and Addenda and also initialing below:

[ X ] Schedule A      Products & System Software Continuation         _CDB_
[ X ] Schedule B      Application Software Continuation               _CDB_
[ X ] Schedule C      Installation, Training & Conversion Services    _CDB_
[ X ] Schedule D      Data Center Processing Services                 _CDB_
[ X ] Addendum 1      Multi Credit Union Processing                   _CDB_
[ X ] Addendum 2      Multi Credit Union Monthly License Fees         _CDB_
[ X ] Addendum 3      Upgrades of CPU                                 _CDB_
[ X ] Addendum 4      Description of Licensed Materials               _CDB_
[ X ] Addendum 5      Additional Terms & Conditions                   _CDB_
[ X ] Exhibit A       Confidentiality Agreement                       _CDB_
[ X ] Exhibit B       Source Code Addendum                            _CDB_
[ X ] Exhibit C       Deferred MANAGER™ Custom Software Modifications _CDB_

THE TERMS AND CONDITIONS ON THE SUBSEQUENT PAGES ARE PART OF THIS AGREEMENT.

OFFER VALID THROUGH:    August 29, 1994

5

# FITECH STANDARD AGREEMENT
## Credit Union On-Line, Inc.

## PART 1. SALE OF EQUIPMENT AND LICENSE OF RELATED SOFTWARE

### 1.1 DEFINITIONS

As used herein:

(a)"Mainframe Equipment" means the specific model of any central processing unit and its associated equipment and the specific model of any file server and associated equipment listed in Schedule A hereto;

(b)"Manufacturer" means the manufacturer of the Products or System Software, as the case may be, designated in Schedule A hereto;

(c)"Micro Equipment" means the specific model of any personal computer and associated equipment listed in Schedule A hereto;

(d)"Products" means Mainframe Equipment, Micro Equipment, or both as applicable;

(e)"System" means Mainframe Equipment and its System Software, collectively, Micro Equipment and its System Software, collectively, or both as applicable; and

(f)"System Software" means the system software specifically listed in Schedule A, including all documentation relating to such software and provided to Customer pursuant to this Agreement, but does not include the Licensed Programs (as defined below).

### 1.2 ORDER

The Customer agrees to purchase the Products and license the System Software and FITECH agrees to sell the Products and license the System Software subject to the terms and conditions set forth herein.

### 1.3 IDENTIFICATION, DELIVERY AND RISK OF LOSS

Identification of the Products shall occur at the moment this Agreement is accepted by FITECH or as soon thereafter as the Products are identifiable. Unless otherwise designated in Schedule A herein, Mainframe Equipment is sold F.O.B. Manufacturer's plant and Micro Equipment is sold F.O.B. FITECH's facility, and the Purchase Price of the Products does not include the cost of freight or insurance against loss or damage in transit. FITECH shall arrange with Manufacturer for shipment of Mainframe Equipment and FITECH shall arrange for shipment of Micro Equipment to Customer and invoice Customer for all freight and other transportation charges and the cost of insuring the Products against damage or loss in transit. Products shall be deemed tendered and risk of loss shall pass to Customer upon delivery of the Products to the common carrier. FITECH shall have the absolute right to deliver Products at one time or in portions from time to time. The delivery of a nonconforming Product, or a default of any nature, in relation to one or more installments of the Products shall not substantially impair the value of the Products as a whole, or this Agreement as a whole and shall not constitute a total breach of this Agreement as a whole.

### 1.4 ACCEPTANCE

Acceptance of the Products ("Acceptance") shall occur with respect to Mainframe Equipment, upon the certification of the operability of the Mainframe Equipment by authorized personnel of Manufacturer at Customer's Facility in accordance with Manufacturer's standard operating procedure, and in the case of Micro Equipment, upon delivery to Customer's Facility and installation by personnel authorized by FITECH. Acceptance of System Software shall occur upon acceptance of the Products. Customer shall have no right to revoke acceptance of the Systems.

### 1.5 SYSTEM SOFTWARE LICENSE

The System Software is the property of its respective Manufacturer and is licensed to Customer pursuant to a separate license agreement between Customer and such Manufacturer unless otherwise stated herein.

### 1.6 INSTALLATION

Installation services for the Products are to be provided by FITECH only if specified in Schedule A, and if specified, at the charges indicated in Schedule A, as and to the extent specified in Schedule C hereto. If no such installation services are specified, then all installation with respect to the Products, and all arrangements therefore shall be the responsibility of the Customer. In no event shall FITECH be responsible for maintenance of the Products, and no maintenance services are to be provided hereunder by FITECH with respect to the Products.

### 1.7 WARRANTY

Customer acknowledges and agrees that the Products purchased and the System Software licensed hereunder have purchased and licensed by FITECH from various Manufacturers for resale or sub-license, as applicable, to Customer and all warranties, if any, other than warranty of title to the Products, including, without limitation, warranties with respect to title to the System Software, materials, workmanship, Product capability and patent rights, are made by such Manufacturers and not by FITECH and that Customer will look solely to such Manufacturers for any remedies under such warranties.

FITECH MAKES NO WARRANTIES TO CUSTOMER WITH RESPECT TO THE SYSTEMS OTHER THAN WARRANTY OF TITLE TO THE PRODUCTS AND SUCH WARRANTY IS MADE EXPRESSLY IN LIEU OF ANY AND ALL EXPRESS OR IMPLIED WARRANTIES TO CUSTOMER, INCLUDING, WITHOUT LIMITATION, ANY AND ALL IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, OR NONINFRINGEMENT AND ALL SUCH OTHER WARRANTIES ARE HEREBY EXPRESSLY DISCLAIMED.

### 1.8 COLLATERAL DOCUMENTS AND SECURITY INTEREST

(a)Customer hereby grants and transfers to FITECH a purchase money security interest in and a security title to each System to secure payment by Customer of the unpaid portion of the Purchase Price, and such security interest and title shall attach to the Systems and be enforceable at the earliest time permitted by law.

(b)If requested by FITECH, Customer agrees to execute and deliver to FITECH any financing statements FITECH deems appropriate to perfect and facilitate enforcement of the security interest and title described in this Section 1.8.

(c)If requested by FITECH, Customer agrees to execute and deliver to FITECH a security agreement and such other documents (in such form as FITECH may direct) as FITECH deems appropriate to further evidence and perfect and facilitate enforcement of the security interest and title described in Section 1.8.

(d)In the event of a default in payment of the Purchase Price of a System, or any portion of such price, pursuant to the terms herein, Customer agrees that FITECH shall have the right to take possession of such System pursuant to applicable law and, to the extend permitted by applicable law, Customer specifically waives any and all rights it may have to any notice of the posting of a bond by FITECH prior to seizure by FITECH of the System, or any portion thereof. In that event, Customer also agrees to assemble the System and make it available to FITECH for pickup at a place to be designated by FITECH.

## PART 2. LICENSE OF APPLICATION SOFTWARE

### 2.1 DEFINITIONS

As used herein:

(a)"Application Software" means the Licensed Programs, the Other Software, and the Licensed Materials, and all portions and components thereof, and all copies and partial copies thereof.

(b)"Customer's Equipment" means all Products designated in Schedule A

## FITECH STANDARD AGREEMENT
### Credit Union On-Line, Inc.

hereto. If the serial number(s) of the Customer's Equipment is (are) not available at the time of execution of this Agreement, Customer shall enter such number(s) in the space provided on the first page hereof as soon as such number(s) is (are) available and provided to Customer by FITECH.

(c)"Licensed Materials" means any documentation relating to the Licensed Programs, including without limitation, flow charts, logic diagrams, program listings, operator and system administrator manuals, and all other printed materials related to the Licensed Programs.

(d)"Licensed Programs" means the FITECH computer programs in object code, machine readable form, listed in Schedule B hereto, excluding System Software (as defined above) and Other Software (as defined below).

(e)"Other Software" means the application or other software not owned by FITECH that is listed on Schedule B hereto, which FITECH is authorized to license to Customer.

### 2.2 LICENSE

FITECH grants to Customer, and Customer accepts, subject to and on the terms and conditions set forth below, a non-exclusive and non-transferable license to use the Application Software on Customer's Equipment (except as provided in Section 2.2(b) hereof) to process the data of Customer. Customer shall have no other right to possess, use, print, copy, or display the Application Software in whole or in part, or to process the data of any other institution, except that Customer may:

(a)copy the Licensed Programs, the Other Software, and those Licensed Materials furnished in machine readable form to provide sufficient copies (but not more than four copies) to support Customer's use of the Licensed Programs and the Other Software as authorized under this Agreement. Licensed Materials provided by FITECH in printed form may not be copied or duplicated, and additional copies must be obtained under license from FITECH at the charges then in effect and

(b)The Customer is authorized to transfer the license to and to use the Application Software on:

(i)     a backup machine when the Customer's Equipment or an associated unit required for use of the Licensed Programs or Other Software is temporarily inoperable until operable status is restored and processing on the backup machine is completed.

(ii)    another machine for assembly or compilation of the Licensed Programs or Licensed Materials if the designated machine and its associated units do not provide the configuration required for assembly or compilation; or

(iii)   the Customer's Equipment at a facility other than the Customer's Facility if the Customer's Equipment shall be moved to such other facility and Customer shall have notified FITECH, in writing of the address of such facility not less than thirty (30) days prior to such move.

The license granted hereunder is a license authorizing Customer to use the Application Software only on Customer's Equipment, no transfer of title to or any other interest in the Application Software is effected hereunder.

### 2.3 CONFIDENTIALITY DISCLOSURE

The Application Software, and all copies thereof made by or furnished to Customer (including partial copies, translations, compilations, partial copies within modifications or merged works and updated works) are the property of FITECH or its vendors; and all rights in patents or copyrights applicable thereto are and shall remain vested in FITECH or its vendors. Customer acknowledges that the Application Software constitutes a valuable asset and trade secrets of FITECH or its vendors. Accordingly, Customer shall:

(a)hold the Application Software and the terms of this Agreement in strict confidence;

(b)not, and shall instruct its agents and employees not to, sell, lease, assign, transfer, or otherwise make available the Application Software or the benefit thereof to others, without the prior written consent of FITECH;

(c)not copy or duplicate by any means, in whole or in part, the Application Software or any documentation or other materials furnished to

Customer by FITECH with or as a part of the Application Software, except for copies necessary for Customer's own data processing operations and expressly permitted hereunder;

(d)not remove or permit to be removed from the Application Software any notice placed thereon by FITECH indicating the confidential nature of, or the property right of FITECH or its vendors in such item:

(e)reproduce and include FITECH's or its vendors' copyright notice (in the form specified by FITECH) on all copies, in any form, including partial copies, of the Application Software or any documentation or materials furnished to Customer by FITECH with or as part of the Application Software;

(f)limit access to the Application Software to only those employees of Customer who need access to the Application Software for Customer's business, and, if requested by FITECH, Customer shall require its employees to execute FITECH's or its vendors' standard non-disclosure agreements; and

(g)not, and shall instruct its agents and employees not to, use any information, in tangible or intangible form, which has been or may be disclosed to its employees by FITECH under or in connection with this Agreement for the purpose of creating, duplicating, or attempting to create, duplicate, or "reverse engineer" the Application Software, any documentation furnished with or included in the Application Software, or any computer programs which perform functions substantially similar to the functions performed by the Licensed Programs.

In the event Customer becomes aware that any person or entity (including without limitation, any employee of Customer) is taking or threatens to take any action which would violate any of the foregoing provisions were that person or entity a party to this Agreement, Customer shall promptly and fully advise FITECH (with written confirmation as soon as practical thereafter) of all facts known to Customer concerning such action or threatened action. Customer shall not in any way aid, abet or encourage any such action or threatened action. Customer agrees to cooperate in all ways reasonably requested by FITECH to prevent such action or threatened action, including, without limitation, instituting or permitting to be instituted in Customer's own name (but solely at the expense of FITECH or its vendors) legal action to prevent such action or threatened action; and Customer agrees to do all things and cooperate in all ways as may be reasonably requested by FITECH to protect FITECH's or its vendors' trade secret and property rights in and to the Application Software.

In the event of a violation of any of the foregoing provisions of this Section 2.3 by Customer, Customer acknowledges that FITECH will not have an adequate remedy in money damages, and accordingly, shall be entitled to a temporary restraining order without notice, and thereafter to a temporary and permanent injunction against such breach without any requirement to post bond as a condition of such relief, all in addition to any other available legal or equitable remedies.

In the event of any breach by Customer or its agents, servants, or employees, which suffers or permits the Licensed Program or any of the components thereof to come into the hands of any unauthorized person, firm or corporation, Customer agrees, at its expense, to retrieve and deliver to FITECH the Licensed Program or such components. If FITECH elects voluntarily to take any steps to retrieve or recover the Licensed Program or components, (which FITECH may, but shall be under no obligation to perform), then FITECH shall be entitled to recover from Customer FITECH's actual expenses and attorneys' fees incurred in efforts to retrieve the same.

### 2.4 INSTALLATION, TRAINING AND CONVERSION

FITECH will assist Customer in the installation of the Licensed Programs and Other Software as and to the extent specified in Schedule C hereto. Customer agrees to reimburse FITECH as specified in Schedule C, for reasonable travel and living expenses incurred by or on behalf of FITECH and its personnel in furnishing any installation, conversion, and training services hereunder.

The installation, conversion, and training services described in Schedule C hereto should be accomplished in the time specified in said Schedule C if Customer fully performs its obligations hereunder and in connection herewith. If the installation services, the conversion services, or the training of

# Credit Union On-Line, Inc.

Customer's personnel requires more than the maximum number of days specified in Schedule C, FITECH shall not be obligated to, but will, if requested by Customer, use reasonable efforts to provide additional Installation, conversion, and/or training services. Customer agrees to pay FITECH for such additional services at FITECH's standard rates then in effect, and shall reimburse FITECH as specified in Schedule C for reasonable travel and living expenses incurred by FITECH and its personnel in providing such additional services. Except as provided in Schedule C hereto, Customer is solely responsible for conversion of Customer's existing files and data to a form compatible with the Application Software.

## 2.5 WARRANTY

As provided in Part 3 hereof, FITECH shall support the Application Software as specified therein for so long as the Annual License Fee is paid and this Agreement has not terminated pursuant to Part 4 hereof. SUCH SUPPORT IS IN LIEU OF ALL WARRANTIES; ACCORDINGLY, FITECH MAKES NO WARRANTIES WITH RESPECT TO THE APPLICATION SOFTWARE, EXPRESSED OR IMPLIED, INCLUDING BUT NOT LIMITED TO IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, AND ALL SUCH WARRANTIES ARE EXPRESSLY DISCLAIMED. Customer is solely responsible for (i)determining the appropriate uses and limitations of the Application Software in Customer's operations, and (ii)the integrity of Customer's data and the backup of such data, and for balancing input data.

## 2.6 PATENT AND COPYRIGHT INDEMNITY

FITECH will defend Customer against a claim that Licensed Programs or Licensed Materials furnished and used within the scope of the license granted hereunder infringe a U.S. patent or copyright, and FITECH will pay resulting costs, damages and attorney's fees finally awarded, subject to the limitations on liability set forth herein, provided that (i)Customer promptly notifies FITECH in writing of the claim; and (ii)FITECH has sole control of the defense and all related settlement negotiations. However, if the costs and damages attributable to a claim of infringement of a U.S. patent may exceed such limitation of liability, Customer may elect to defend against the claim provided that FITECH may fully participate in the defense and/or agrees to any settlement of such claim. If such claim has occurred or is in FITECH's opinion is likely to occur, Customer agrees to permit FITECH at its option and expense, either to procure for Customer the right to continue using the Licensed Programs or Licensed Materials or to replace or modify the same so that they become non-infringing. If neither of the foregoing alternatives is reasonably available, Customer agrees, on one-month's written notice from FITECH, to return or destroy the original and all copies of the Licensed Programs or Licensed Materials received from FITECH and all copies thereof.

FITECH shall have no obligation to defend Customer or to pay costs, damages, or attorney's fees for any claim based upon 1) use of other than a current unaltered version of the Licensed Programs if such infringement would have been avoided by the use of a current unaltered version of the Licensed Programs, or 2) the combination, operation, or use of any Licensed Programs or Licensed Materials furnished hereunder with non-FITECH programs or data if such infringement would have been avoided by the combination, operation or use of the licensed program materials with other FITECH programs or data.

## 2.7 ESCROW AGREEMENT

It is understood and agreed that this Agreement does not entitle Customer to access to the source code of the Licensed Programs; FITECH agrees, however, to deposit the source code to the Licensed Programs in escrow with NationsBank, Greensboro, North Carolina. Upon the occurrence of any of the events listed below, Customer may make written request to NationsBank for the source code to the Licensed Programs licensed by Customers hereunder and, upon receipt of such written request from Customer and payment by Customer of the costs of reproduction and shipment, NationsBank shall deliver to Customer one copy of the source code in machine readable form.

The events entitling Customer to obtain the source code are:

(a)A petition in bankruptcy is filed by or against FITECH and remains unstayed or unvacated for a period of thirty (30) days.

(b)FITECH makes a general assignment for the benefit of creditors.

(c)FITECH is adjudged insolvent by a court of competent jurisdiction.

(d)A custodian, trustee, or receiver of all or a substantial portion of the property of FITECH is appointed.

# PART 3. MAINTENANCE AND SUPPORT SERVICES

## 3.1 TERM OF PART 3

This Part 3 shall be effective upon the date FITECH or Customer begins to install the Application Software pursuant to the INSTALLATION, TRAINING, and CONVERSION Section of Part 2 above (the "Effective Date"), and shall remain in force, except as otherwise provided herein, until termination in accordance with the provisions of Part 4 hereof.

## 3.2 SERVICES

In consideration of the Annual License Fee FITECH shall provide to Customer the maintenance and ongoing services listed below in this Paragraph.

(a)Telephone Support. FITECH will furnish to Customer a telephone number for use by Customer to obtain reasonable operator support and advise relating to the functions of the Licensed Programs and Other Software.

(b)Program Fix Service. If a Licensed Program as furnished and, without Customer modification, fails to function in accordance with the published specifications set forth in the Licensed materials hereto due to an error in the Licensed Programs and Customer has reasonably determined that the failure is not due to incorrect or defective data entry or operator performance, FITECH will make a prompt and reasonable attempt to provide Customer with a program patch to correct such error or program around such error or malfunction. FITECH shall have the right to verify the existence of any error reported by Customer and FITECH shall have no obligation to correct any error or defect unless the error or defect can be recreated with the latest unaltered version of the Licensed Program. Error Verification shall be conducted at Customer's or FITECH's place of business, as determined by FITECH.

(c)Software Enhancements. FITECH shall provide Customer with any Enhancement(s) to the Licensed Programs that FITECH may acquire or develop and offer to other licensees of the Licensed Programs during the term of this Agreement. FITECH will provide the Enhancements in such form and with accompanying instructions sufficient to enable Customer to install the Enhancements without the assistance of FITECH. Unless FITECH is requested by Customer to install the Enhancements, Customer shall be solely responsible for such installation. If requested by Customer, FITECH will install the Enhancements at FITECH's hourly rates then in effect plus reimbursement for reasonable travel and living expenses incurred by FITECH and its personnel in providing such installation services. As used herein, the term "Enhancement" means any software development announced from time to time by FITECH as an "Enhancement" to the Licensed Programs. Customer agrees that any Enhancement provided by FITECH shall be held upon all of the terms and subject to all of the conditions contained in this Agreement.

(d)Exclusions. FITECH shall not be required to provide any maintenance or support services occasioned by (1) neglect or misuse of the Licensed Programs or Equipment, (2) unauthorized alterations or modifications of the Licensed Programs, or (3) Customer's failure to maintain an adequate and knowledgeable staff trained by FITECH in the use of the Application Software. All other programming services or assistance will be provided to Customer at the standard hourly rates of FITECH in effect at the time services are rendered.

## 3.3 STANDARD OF PERFORMANCE

It is understood and agreed that the sole obligation of FITECH under Part 3 of this Agreement is to provide the services described in Section 3.2 hereof. Customer shall bear sole responsibility for supervision, management, and control of the Licensed Programs, including, but not limited to, assuring proper audit controls and operation methods, and implementing sufficient procedures to satisfy its requirements for security, of data and files and accuracy of input and output.

JUN-30-2003  11:55        LIBERTY FITECH SYSTEMS          404 233 4815      P.06

## Credit Union On-Line, Inc.

### 3.4 INCREASE IN CHARGES

Upon not less than sixty(60) days prior notice to Customer, FITECH may, in its sole discretion, increase the Annual License Fee specified on Schedule B hereof. Any such increase(s) in charges will be effective on the Annual License Fee due date first following the notice of increase.

### 3.5 WARRANTY

THE PROVISIONS OF THIS PART 3 SET FORTH ALL OF THE RIGHTS AND RESPONSIBILITIES BETWEEN FITECH AND CUSTOMER IN CONNECTION WITH MAINTENANCE AND ON-GOING SUPPORT SERVICES WITH RESPECT TO THE APPLICATION SOFTWARE. THEY TAKE THE PLACE OF AND SUPERSEDE ALL WARRANTIES, WHETHER OF MERCHANTABILITY, FITNESS, OR OTHERWISE.

## PART 4. TERMINATION

Subject to termination by FITECH or Customer as herein provided, the terms of (a)license(s) with respect to the Application Software hereunder (the "License") shall commence on the Effective Date and continue thereafter until terminated as hereinafter provided and (b)the Maintenance and Support Services Agreement furnished pursuant to Part 3 hereof (the "Support Agreement") shall be three (3) years, but the Support Agreement shall be automatically renewed for one (1) year periods thereafter, unless FITECH shall notify Customer, in writing, not later than ninety (90) days before the expiration of the initial or any renewal term hereof, that the Support Agreement shall not be renewed. Customer may terminate the License and Support Agreement at any time upon written notice to FITECH. The License shall terminate immediately upon the termination of the Support Agreement. FITECH shall have the right to terminate the License and Support Agreement upon the occurrence of any of the following events: (a)Customer shall not pay when due any sum owed hereunder (including the Annual License Fee) and such non-payment continues for more than thirty (30) days after demand by FITECH, (b)Customer shall breach or fail to perform any provision of the CONFIDENTIAL DISCLOSURE provisions of this Agreement, (c)Customer shall breach or fail to perform any other provisions of this Agreement and the same is not cured within ten (10) days after notice of such breach or failure has been given by FITECH to Customer, (d)Customer shall not implement the most recent version of the Application Software within ninety (90) days of the date such version is provided to Customer by FITECH, or (e)Customer shall become insolvent or shall make an assignment for the benefit of its creditors or there shall be filed by or against Customer any bankruptcy, receivership, reorganization, or other like proceeding under any present or future debtor relief law or law relating to financial institutions. FITECH'S right to terminate the License or the Support Agreement shall be exercised by a written notice given to Customer; and the termination of the License or the Support Agreement shall be effective immediately upon the giving of such notice. Any termination of the License or the Support Agreement shall be in addition to, and not in lieu of, any other rights or remedies available to FITECH at law or in equity for or with respect to the occurrence upon which such termination was based; and all such rights and remedies shall be cumulative. Except as provided otherwise herein, no portion of the Initial License Fee or the Annual License Fee shall be returnable or refundable upon termination of the License or the Support Agreement, whether such termination is by Customer or FITECH. Upon the termination of the License or the Support Agreement for any reason, Customer shall immediately cease all use of the Application Software, shall delete the Application Software from any computer equipment of Customer on which the Application Software is then installed, and shall return to FITECH all tangible portions of the Application Software, delivered or disclosed to Customer by FITECH under or in connection with this Agreement, and all modifications thereto, whether made by Customer or FITECH, together with all copies thereof (other than copies which Customer warrants, in writing, it has destroyed) at any time made by Customer. The provisions of this Agreement relating to the confidentiality and nondisclosure of the Application Software shall survive the termination of this Agreement and the License granted hereunder.

## PART 5. GENERAL PROVISIONS

### 5.1 CUSTOMER OBLIGATIONS

In order to enable FITECH effectively to perform its obligations hereunder Customer will:

(a)Within ten (10) days following the execution of this Agreement designate an individual as the sole representative of the Customer who shall be authorized to make decisions, approve plans and grant requests on behalf of the Customer in connection with the definition and installation of the Application Software.

(b)Provide to FITECH free access to the Application Software and Customer's Equipment at all reasonable times for the purpose of allowing FITECH to perform its obligations hereunder.

(c)Fully cooperate with FITECH by, among other things, making available as reasonably required by FITECH, management decisions and personnel in order that the work of FITECH contemplated hereby may be properly accomplished.

(d)Maintain the Customer's Equipment, or cause the Customer's Equipment to be maintained, in proper working order during the term hereof.

(e)Exercise all due diligence in the performance of its obligations hereunder in connection with the installation and preparation for use of the Application Software.

(f)Maintain an adequate and knowledgeable staff to utilize the Application Software properly. Customer agrees to provide such training as may be required in FITECH's reasonable judgment to those personnel of Customer who are integral to the efficient operation of the Application Software. FITECH reserves the right to refuse Telephone Support to any of Customer's personnel who have not been trained by FITECH.

### 5.2 REMEDIES

Customer's exclusive remedies with respect to the Products and Other Software shall be those provided by the respective Manufacturers of such Products and authors of the Other Software. Customer's exclusive remedy with respect to the Licensed Programs shall be FITECH's obligation to provide a program patch or program around errors pursuant to Part 3 above. In the event that the remedies provided to Customer herein with respect to the Products, Other Software, or the Licensed Programs are deemed in a court of law to have failed in their essential purpose, the Customer's sole and exclusive remedy shall be the removal of the defective portion of the Product, Other Software, or Licensed Programs, as the case may be, and refund of the Initial License Fee paid by Customer to FITECH hereunder in respect of such defective portion; and if all of the Licensed Programs shall have been removed as defective, then upon the removal and refund provided for herein, the License shall terminate automatically.

FITECH will not be liable for any failure or delay in the performance of any of its obligations hereunder if such failure is due in whole or in part to any cause beyond FITECH's control. IN NO EVENT WILL FITECH BE LIABLE FOR ANY INDIRECT, SPECIAL, INCIDENTAL, OR CONSEQUENTIAL DAMAGES ARISING OUT OF THIS AGREEMENT OR THE USE BY LICENSE OF THE PRODUCT, APPLICATION SOFTWARE, OR ANY SERVICE PROVIDED BY FITECH UNDER OR IN CONNECTION WITH THIS AGREEMENT; FITECH's liability to Customer for any cause whatsoever, and regardless of the form of action and whether in contract or tort, shall in no event exceed the amounts paid by Customer hereunder for such System, Application Software, or Service.

### 5.3 CHANGES

In the event (i) the work to be performed by FITECH incident to the definition, design, installation, or implementation of the Application Software, or any part thereof, or (ii) the type or capacity of Customer's Equipment and System Software shall be changed due to:

(a)erroneous, incomplete, or inaccurate information furnished to FITECH by the Customer relating to the application, use, definition, or design of the Application Software in Customer's operations; or

(b)the volume of data generated by Customer's business operations to be processed by the Products and the Application Software shall substantially increase or be discovered to be greater than as originally determined; or

9

JUN-30-2003  11:56         LIBERTY FITECH SYSTEMS    _____        404 233 4815    P.07

# Credit Union On-Line, Inc.

(c)changes requested by Customer in the capabilities, function, definition, or design of the Application Software or Products from that set forth herein and in the documentation furnished by FITECH hereunder; then in any of such events, FITECH, at its option, may either:

(i) if agreed to by Customer, make such changes in the definition, design, installation, or implementation of the Application Software, Products, or any part thereof, as shall be required by any of the foregoing events and be paid for all work and additional equipment incident to such changes at FITECH's standard rates and charges therefore then in effect, which rates and charges Customer agrees to pay as an additional Installation Fee or Purchase Price hereunder; or

(ii) continue performance of this Agreement without regard to the occurrence of any of the foregoing events (making only such changes in the Application Software or Products required by such events as will not, in FITECH's judgement, increase its cost of performance hereunder) and be relieved of all liability or responsibility for making or installing any other changes in the definition, design, installation, or implementation of the Application Software, Products, or any part thereof, required by any such events; or

(iii) terminate this Agreement and the License granted hereunder and, upon return to FITECH of all Equipment (in substantially the same condition as when delivered to Customer), System/Other Software, and Application Software theretofore delivered to Customer, refund to Customer any sums theretofore paid by Customer hereunder, less FITECH's charges at its standard rates for work performed by FITECH prior to such termination.

## 5.4  MISCELLANEOUS

Services provided by FITECH to Customer outside the scope of this Agreement will be furnished at FITECH's applicable time and material rates and upon terms then in effect and applicable to FITECH's customers and licensees generally.

FITECH shall neither use nor disclose to any other person, either during the term of this Agreement or thereafter, without Customer's written consent, any confidential information to which FITECH is given access in the course of performance of its obligations hereunder. When used herein, the term "confidential information" shall mean records, account data, and other information which are not publicly available, relating to the business affairs of Customer and its customers, but shall not include any ideas, concepts, or techniques relating to the Licensed Programs which FITECH develops as a result of its performance of this Agreement.

In the event FITECH deems it necessary to enforce any of the provisions of this Agreement by or through an attorney at law, Customer shall pay all costs of such enforcement to FITECH, including, without limitation, reasonable FITECH attorney's fees incurred in such enforcement.

In the event of a delay in delivery or installation hereunder due to circumstances beyond FITECH's control, FITECH shall have the right to extend the date of delivery or installation for a reasonable period of time after the period of delay (but in no case for less than the period of delay) and shall have the right to apportion its materials and products among its customers in such manner as it may deem equitable. Customer is not relieved from accepting delivery or installation at the agreed upon price when the cause interfering with delivery or installation is removed. If delivery is in installments, delay in delivery of any installment shall not relieve Customer of its obligation to accept delivery of the remaining installments at the agreed upon price.

Neither this Agreement nor any right herein or in or to the Application Software may be assigned by the Customer without the prior written consent of FITECH. This Agreement and all rights herein may be assigned by FITECH without any prior consent or approval of Customer.

THIS AGREEMENT CONSTITUTES THE ENTIRE AGREEMENT AND UNDERSTANDING BETWEEN FITECH AND CUSTOMER CONCERNING THE SUBJECT MATTER HEREOF, AND CANCELS, TERMINATES, AND SUPERSEDES ALL PRIOR WRITTEN AND ORAL UNDERSTANDINGS, SALES AND PROMOTIONAL MATERIALS, AGREEMENTS, PROPOSALS, PROMISES, AND REPRESENTATIONS OF THE PARTIES RESPECTING ANY SUBJECT MATTER CONTAINED HEREIN. No representation or promise hereafter made by a party, nor any modification or amendment of this Agreement, shall be binding upon either party unless in writing and signed by Customer and accepted in writing by an authorized officer of FITECH at its offices in Atlanta, Georgia or Greensboro, North Carolina.

Amounts payable to FITECH hereunder are payable in full without deduction or setoff, and are net of all sales, use, or other taxes or duties. Customer shall duly and timely pay all taxes and duties, however designated, levied, or based upon amounts payable to FITECH hereunder (exclusive of United States Federal, state or local taxes based upon the net income of FITECH) for the ownership, use, or possession of the Products, System Software, and/or Application Software. Customer agrees to indemnify and hold FITECH harmless from any such taxes or duties which any federal, state or local taxing authority requires FITECH to pay. It shall be Customer's sole obligation after payment to challenge the applicability of any tax. Customer shall not deduct from payments due FITECH hereunder any amounts paid or payable to third parties for taxes or duties, however designated, or any other sums.

Any notice required or permitted to be given under this Agreement shall be deemed given when reduced to writing and placed in the United States mail with first class and certified mail, return receipt requested, postage fully prepaid, and addressed to the other party at the addresses shown on the first page and third page of this Agreement or at such other addresses as such party from time to time may indicate by written notice given to the other party hereto.

The invalidity or unenforceability of any particular provision of this Agreement shall not affect the other provisions hereof, and this Agreement shall be construed in all respects as if such invalid or unenforceable provision had been omitted. This Agreement shall be governed by and construed in accordance with the laws of the State of Georgia.

The heading of several divisions of this Agreement are for convenience only and shall not be construed to be a part of this Agreement.

Subject to all of the terms and conditions hereof, this Agreement inures to the benefit of and is binding upon the parties hereto and their successors and assigns.

The waiver of a breach of any provision of this Agreement, or of any condition or covenant must be in writing and shall be a waiver of any subsequent breach of the same or any other provision, condition, or covenant of this Agreement.

10

C:\Liberized FiTech\International...CU_Inc. hd



# Credit Union On-Line, Inc.

# ADDENDUM 5

This Addendum 5 is attached to and forms a part of the Agreement dated __August 29__, 1994, between FiTECH Systems, L.P. and CREDIT UNION ON-LINE, INC.

The following additional terms, conditions, and understandings of the Agreement supersede the relevant provisions in the Standard Agreement and control the interpretation thereof:

Page 10, SECTION 3.4, INCREASE IN CHARGES is amended by adding the following sentence to the end of the section:

"FiTECH agrees to not increase the Annual License Fee for the Application Software initially licensed as part of this Agreement prior to January 1, 1997. After January 1, 1997, FiTECH agrees to not increase the Annual License Fee more often than once every twelve (12) months, and shall limit any such increases to no greater than the increase in the current CPI as published by the U.S. Department of Labor for all Urban Consumers (CPI-U) based on the index value available twelve (12) months prior to the date FiTECH notifies Customer of such increase in the Annual License Fee and the index value available on the date of such notice."

2.    Page 11 is amended by adding the following new section:

"5.5 DISPUTES

    (A)  Any controversy or claim, whether based on contract, statute, tort fraud, misrepresentation or other legal theory, related directly or indirectly to this Agreement or any of the Application Software or service, whenever brought, and whether between Customer and FiTECH, or any of FiTECH's or Customer's employees, agents, or affiliated businesses, will be resolved by arbitration in accordance with the terms of this Section 5.5, except that FiTECH reserves the right to seek injunctive relief for a breach or threatened breach by Customer of the Confidentiality provisions of Section 2.3 hereof or a breach or threatened breach of the provisions hereof of restricting and limiting Customer's use of the Application Software. The Federal Arbitration Act, 9 U.S.C. Sections 1 to 15, not state law, will govern the arbitrability of all claims.

    (B)  A single arbitrator who is knowledgeable in business information and electronic data processing systems will conduct the arbitration under the then current rules and supervision of the American Arbitration Association (AAA). The arbitrator's decision and award will be final and binding and may be entered in any court with jurisdiction. The arbitrator will not have authority to award punitive or other non-compensatory damages to either party. The arbitration will be held in Atlanta, Georgia.

    (C)  FiTECH and Customer will each bear its own attorney fees associated with the arbitration. FiTECH and Customer will pay all other costs and expenses of the arbitration as the rules of AAA provide.

    (D)  If one party files a court action alleging claims subject to arbitration under this Section, and the other party successfully stays the court action and/or compels arbitration of the claims, the party filing the court action will pay the other party's costs and expenses, including attorney's fees.

# SCHEDULES A-D OMITTED

# EXHIBITS
# A C
# OMITTED

# FiTECH Systems
## 3098 Piedmont Road, Suite 200
## Atlanta, GA 30305
## (404) 262-2298
## (404) 233-4815 (Fax)

FAX TO:     Ms. Connie Boretti
            Credit Union On-Line, Inc.
            FAX NO.: 781-642-6120

FROM:       Sandy N. Greer

DATE:       August 21, 2000

Please sign the "Consent to Assignment of Contract" form that follows this fax.

(YOU WILL **NOT** RECEIVE A COPY OF THIS FORM IN THE MAIL.)

**Please fax the signed document to:**

Katherine Palmer
FiTECH Systems
3098 Piedmont Road, Suite 200
Atlanta, GA 30305
FAX:  404-233-4815

Also, please mail the signed document to Kathcrine Palmer at the above address.

Thank you for your immediate attention to this matter.

TOTAL # OF PAGES, INCLUDING THIS PAGE:  3

*(If you experience any problems receiving this FAX, please give us a call).*

Exhibit B
Credit Union Opposition
November 19, 2004

# FITECH SYSTEMS, L.P.
## CONSENT TO ASSIGNMENT
## OF CONTRACT

1.      Credit Union On-Line, Inc. ("CUOL") has been informed that:

    (a)      FiTECH Systems, L.P. ("FiTECH") has entered into a definitive agreement with FAI, Inc. ("FAI") pursuant to which FiTECH will sell substantially all of its assets related to its Credit Union business to FAI, a newly formed subsidiary of Liberty Enterprises, Inc. ("Liberty"); and

    (b)      In connection with the closing of the proposed transaction, FiTECH and FAI seek the consent of CUOL to the assignment of the Standard Agreement dated 8/1/1994 (the "Agreement") with FiTECH to FAI.

2.      CUOL hereby consents to the assignment of the Agreement to FAI. CUOL understands that FAI will change its name at or shortly after closing to FiTECH Systems, Inc., or possibly another name. CUOL also consents to the assignment of the Agreement by FAI to any other affiliate of FAI or Liberty now or in the future.

3.      CUOL confirms that the amount due to FiTECH from CUOL for all periods ended prior to the date of this Consent to Assignment of Contract is $3,014.00, and that upon receipt of such amount, CUOL will have paid all amounts required of it under the Agreement.

4.      CUOL confirms that CUOL has no knowledge of any breach or default by FiTECH or any other party under the Agreement.

Credit Union On-Line, Inc.

By:_____

Name:_____

Title _____

RA016825

*Signed + Returned*
*Cost Board*
*approved* CB



**SYSTEMS**

3098 PIEDMONT ROAD, N.E. • SUITE 200 • ATLANTA, GEORGIA 30305 • 404 / 262-2298

August 14, 2000

Credit Union On-Line, Inc.
600 Main Street
3rd Floor
Waltham, MA  02452

      Attention:  Connie Boretti, President

      Re:    Credit Union On-Line, Inc. ("CUOL") Standard Agreement dated 8/1/1994 (the
           "Agreement"), with FiTECH Systems, L.P. ("FiTECH")

Dear Sir or Madam:

      FiTECH has entered into a definitive agreement with FiTECH Acquisition, Inc. ("FAI")
pursuant to which FiTECH will sell substantially all of its assets related to its Credit Union business to
FAI, a newly formed subsidiary of Liberty Enterprises, Inc. ("Liberty"). In connection with the closing
of the proposed transaction, FiTECH and FAI seek the consent of CUOL to the assignment of the
Agreement to FAI.

      Liberty is a privately held company and one of the largest purveyors of payment systems,
marketing services, and technology solutions to credit unions in the United States. Liberty has thirteen
facilities in 8 states, approximately 800 employees and a customer base of over 4,500 credit union
customers. Please visit Liberty's web site at www.libertysite.com for more information about Liberty and
its business.

      Mike Evans and Sandy Greer will be executive employees of FAI, which will change its name at
closing to a new corporate name very similar to FiTECH Systems.

      We hereby request that CUOL permit the assignment of the Agreement to FAI by signing the
Consent to Assignment attached to this letter and returning it to the undersigned at the address above in
the enclosed envelope.

      If you have any comments or concerns, please contact Mike Evans at (404) 262-9848 ext 367 as
soon as possible.

      Thank you for your assistance in this matter. Please return the attached Consent to assignment
by August 20, 2000 or as soon thereafter as possible.

      Sincerely,

      FiTECH Systems, L.P.

      By: _____
         Sanders N. Greer, President

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CREDIT UNION ON-LINE, INC.,<br>Plaintiff,<br><br>v.<br><br>OPEN SOLUTIONS, INC.,<br>Defendant. | CIVIL ACTION NO. 04-12176 GAO |

## AFFIDAVIT OF CONSTANCE D. BORETTI

Constance D. Boretti, being sworn, states as follows:

1    I am President and Chief Executive Officer of plaintiff Credit Union On-Line, Inc. ("CUOL"). I make this affidavit to supplement in limited details the Verified Complaint. I am the signatory on the Verified Complaint. This affidavit addresses questions as to transfer of the case to a Georgia Court and a purported arbitration term in a 1994 text.

2.    <u>Transfer To Georgia?</u>  The disputes in question arose after the date in 2003 when Open acquired a nonparty company (Liberty). Open began to sell goods and services due to CUOL under an August, 1994 agreement ("Agreement"). <u>See</u> excerpts of the Agreement ("1994 text") at <u>Tab A</u>. The Agreement had been assigned by the initial obligor, FiTech, to Liberty in 2000. <u>See</u> documents at <u>Tab B</u>, including year-2000 correspondence as to year-2000 assignment by FiTech to Liberty. In July, 2004 I attended a meeting outside Hartford, Connecticut, where I met with at least three officers or principals of defendant Open to discuss the ongoing sales and

-1-

*Exhibit C,*
*credit Union Oppos Nov 19, 04*

services by Open for CUOL (the "Support Agreement"). The President of Open at the meeting in Connecticut specifically mentioned the proposed acquisition of CUOL by Open. Records as to disputes arising from the lack of services by Open are in Connecticut. Connecticut personnel at Open have most knowledge of day-to-day operations or refusals to perform the Support Agreement.

3     At least one other person involved in these disputes, Thomas Tartaro, is an officer of Open working in Connecticut.     am not aware of any FiTech employee in Georgia, where FiTech is located, likely to be a crucial witness at trial. CUOL makes no claim against FiTech

4.     I am resident of Massachusetts, as are any members of CUOL who will be witnesses   Our documents are all here.   Potential nonparty witnesses in this case, to my knowledge, reside in states other than Georgia.

5     Arbitration?  I have attached here at Tab B, for clarification, the front page of the August, 1994 contract between FiTech and CUOL ("Agreement"), plus the front or cover page, plus a page numbered 10.   Page 10 provides that the 1994 text shall be governed by and construed in accordance with the laws of the State of Georgia. That same page provides that the text and the rights therein may be assigned by FiTech  The text does not say that some third person (Liberty), having received an assignment from FiTech, is then allowed to subsequently assign or reassign the Agreement.

6     In or about August, 2000, FiTech, the initial obligor, assigned its rights under the 1994 Agreement text with the consent of CUOL. Documents on that point are attached at Tab B. The terms of the 2000 consent did not permit subsequent reassignment by the new party, Liberty, to the entire world. The consent in 2000 permitted a further assignment of the agreement only to

Liberty or an affiliate of Liberty.    know of no facts to suggest that Open is an affiliate of Liberty. I have never been told that by Open, nor seen any proof of it in documents. Liberty did not obtain CUOL consent to any 2003 assignment to Open. See Tab A. CUOL accordingly does not agree that the 1994 text was validly assigned to Open. See Tab A, Tab B

7.    At no time did CUOL intend or agree to arbitrate disputes with Open or, as to Open, in Atlanta or elsewhere. CUOL did not agree, ever, that the exclusive jurisdiction for the bringing of any cause of action as to the agreement was in Georgia.

8    In my dealings with Open after July, 2003, no person at Open has ever stated that they are not aware of an ongoing support agreement ("Support Agreement"). No person at Open, including Tartaro, has asserted that Open does not understand that it has obligations under the Support Agreement. Tartaro sent a purported notice of default or breach of obligations to CUOL dated August 30, 2004, pursuant to the Support Agreement    I do not know of any facts to suggest that Open at any point in time was in doubt as to the fact that Open purports to be entitled to deliver services under the Support Agreement and therefore is a party to an agreement involving service obligations of Open to CUOL. Open, not CUOL, says the terms of that agreement are the 1994 text. For reasons described in paras. 5 and 6, that is disputed. A service agreement, to my knowledge, need not be in writing.

9.    I am familiar with page 45 of the 1994 text between FiTech and CUOL. I realize there is an arbitration clause in that text. That text is not with Open    That text and that arbitration clause run between FiTech and CUOL. Defendant Open Solutions, Inc. ("Open") has never requested arbitration. If Open wants arbitration, I know of no facts to show that Open is a party to a written arbitration agreement with CUOL and thereby entitled to demand arbitration.

Paras. 5, 6, above.  In all communications with Open as to disputes occurring since July, 2004, Open has at no time demanded arbitration with CUOL in Atlanta, Georgia or anywhere else.  The documents in this case to date, on reliable information, do not include any motion for a stay or any request by Open for an Order compelling arbitration in Georgia.

10.    have no documents or facts to establish that Open is the successor in interest to FiTech as to any right of arbitration.  Our documents suggest that there is a substantial question about that.  Paras. 5, 6, above.

## VERIFICATION

*The undersigned hereby states that she has read the foregoing and that the facts herein are true based on personal knowledge, except for those matters stated on information, and those are believed to be true based on the information and documents presently available and made available to the undersigned.*

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY.

CREDIT UNION ON-LINE, INC.

By: _Constance D Boretti_

Dated: _November 18, 2004_

Constance D. Boretti, President

24805.0//00872121.

- 5 -